SANFORD HOMES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sanford Homes, Inc. v. Commissioner
Docket No. 8277-83.
United States Tax Court
T.C. Memo 1986-404; 1986 Tax Ct. Memo LEXIS 203; 52 T.C.M. (CCH) 310; T.C.M. (RIA) 86404; August 27, 1986. Melvin A. Coffee and Michael T. McDonnell, for the petitioner. Mark H. Howard, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent *204 determined a deficiency in petitioner's Federal income tax of $580,713.00 for 1979, or alternatively, $294,736.00 for 1980. There are two issues: (1) whether property distributed by a partnership to petitioner's subsidiary [1] was held by the partnership for investment or for sale to customers; and (2) whether section 751 [2] applies to distributions made upon the termination of a partnership. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and exhibits attached thereto are incorporated herein by reference. Petitioner, Sanford Homes, Inc. ("Sanford Homes"), had its principal place of business in Englewood, Arapahoe County, Colorado, at the time the petition in this case was filed. At all relevant times Charles H. Sanford ("Sanford") was its sole shareholder, president, *205 and chief executive officer. In 1971, a partnership called SMS Joint Venture ("SMS") was organized by Sanford and two Colorado corporations, Medema Building Corp. ("Medema"), and Skufca and Shelton Company ("Skufca"), as equal partners. Each of the partners had previous experience in home-building, but none of them had any experience in the development of shopping centers. The partnership agreement, signed in 1971, stated that the purpose of the partnership was to purchase a 1080 acre tract of land located in Arapahoe County and zoned agricultural, divide the tract into parcels, classify each parcel as residential, commercial, or some other acceptable designation, and then sell the parcels, or in the alternative, some of the parcels could be "committed by [SMS] to be retained as investment property." Under the agreement, each partner had the right to purchase any of the residential parcels, but commercial parcels could be sold to a partner only by unanimous consent of the partners. Parcels committed to investment were not to be sold. In November 1971, SMS purchased the tract of land for $5,000,000. Within a year SMS also acquired three smaller tracts of unimproved land. With *206 the exception of a small portion of the combined tracts which was leased to farmers for grazing horses, SMS proceeded to develop the property in accordance with the partnership agreement. In 1972, SMS prepared a comprehensive plan which contemplated a division of the land into approximately 46 parcels, with each parcel being designated for residential, public, commercial, or office use. Upon completion, the plan was filed by SMS with the Board of Arapahoe County Commissioners ("County Commissioners") as part of a request to have the property rezoned as set out in the plan. While the rezoning request was pending, each of the original three partners transferred their partnership interests to newly-formed corporations owned by the respective partners, with the result that Sanford's partnership interest was transferred to Development West Corporation ("Development West"), Medema's partnership interest was transferred to Wilridge Corporation ("Wilridge"), and Skufca's partnership interest was transferred to Oxford Development Company ("Oxford). Development West and Wilridge then bought the interest of Oxford. Consequently, thereafter SMS had only two equal partners, i.e., Development *207 West, Sanford's successor; and Wilridge, Medema's successor. In the meantime Sanford had transferred all of the outstanding stock in Development West to petitioner; thus, Sanford was the sole shareholder of petitioner, which in turn was the sole shareholder of Development West. In December 1973, the County Commissioners approved all of SMS' rezoning requests with respect to the residential parcels, but allowed only the commercial request with respect to parcel 11 and disallowed the commercial requests with respect to parcels 5, 7, 24, and 46. Prior to the time that the County Commissioners acted on the rezoning requests, Dayton Hudson Properties, the owner of Target Stores, had contacted SMS about the possibility of locating a store on parcel 7. These negotiations continued after the rezoning request for parcel 7 was denied. Sanford and the president of Medema met with the representatives of Dayton in February of 1974, and during this meeting Medema's president told Dayton's representatives that Wilridge was willing to sell its interest in parcel 7. At this time, Sanford was undecided about what to do with Development West's interest and was even considering the possibility *208 of acquiring Wilridge's interest. In April 1974, SMS filed a second rezoning request with the County Commissioners which sought office zoning for parcels 4, 5, and 24 and commercial zoning for parcels 7 and 46. The second request was accompanied by a detailed report concerning the proposed office developments for parcels 4, 5, and 7. In December 1974, the County Commissioners denied all of the rezoning requests except for parcel 24 which was changed from agricultural to commercial. After the initial meeting between Dayton and SMS in 1974, Sanford continued to meet with the Dayton representatives. Representatives of American Continental Corporation, Medema's parent corporation, attended one of these meetings and again indicated that Wilridge's interest was for sale. Off and on for the next three years Sanford and Dayton talked about the possibility of building a shopping center on parcel 7, and in December 1977, Sanford and Dayton representatives were discussing the terms under which Dayton would purchase a portion of parcel 7 if commercial zoning were obtained. Medema did not take part in any of these negotiations. In April 1978, SMS filed with the County Commissioners a *209 third rezoning request, in which it sought to have parcels 4, 5, and 7 rezoned to a mixed use of residential and commercial. This request was accompanied by a comprehensive report on the shopping center proposed for part of parcel 7. In October 1978 the rezoning for parcels 4 and 5 was approved, but the rezoning was denied for that part of parcel 7 which was to be the site of the proposed shopping center. After the denial of the third request to rezone, Development West and Wilridge dissolved SMS.At that time, the partnership owned only parcels 4, 5, and 7 and two pieces of land zoned for use as open space and drainage. All of the rest of the property had been sold by SMS during the previous six years, the residential sites in approximately twenty-four sales, going for the most part to petitioner, Sanford, and Medema. The two commercial sites, parcels 11 and 24, had been sold to petitioner and the other to a non-related party. SMS reported the gain on all of these sales as ordinary income. Upon the dissolution of SMS in November 1978, all of the remaining real estate was distributed to the partners. Wilridge received parcels 4 and 5, the portion of parcel 7 that had been rezoned *210 for mixed use, and twelve acres zoned for open space. Development West received 131 acres zoned for open space and that part of parcel 7 for which rezoning for use as a shopping center had been denied in the third request. As part of the dissolution, Wilridge assigned to Development West any right which Wilridge had to appeal the denial of the rezoning. The total value of the properties received by each partner upon the dissolution of the partnership was $2,238,000. Immediately after the dissolution, Development West filed a suit against the County Commissioners for an order directing the Commissioners to rezone that portion of parcel 7 distributed to Development West. In 1980, Development West sold the property to Kaiser Foundation Health Plan of Colorado ("Kaiser") for $2,732,120, and the suit was dismissed. Kaiser succeeded in having the property rezoned for use as a site for a hospital. On their consolidated return for 1980, petitioner and its subsidiary, Development West, reported the gain on the sale to Kaiser as a capital gain. On the consolidated return for 1979 no gain from the dissolution of the partnership was reported. OPINION In the notice of deficiency respondent *211 took alternative positions. First, that parcel 7 was held by SMS primarily for sale to customers and, therefore, under section 735 petitioner's gain on the sale to Kaiser in 1980 was ordinary income. Second, if parcel 7 is found to have been held by SMS for investment, then petitioner had a recognized gain under section 751 upon SMS' dissolution in 1979. If a partner receives property in a distribution from a partnership which has been held by the partnership primarily for sale to customers in the ordinary course of its trade or business and the partner sells such property within five years of the distribution, any gain from the sale will be ordinary income. Sections 735(a)(2), 751(d)(2), and 1221(1).[3] Respondent contends that the above sections are applicable to this case because parcel 7 was held by SMS primarily for sale to customers, whereas petitioner claims that the property was held by SMS for investment and the sections are not applicable. The manner in which the property was held is a question of fact, , and petitioner has the burden of proving that respondent's characterization of the *212 holding of the property is erroneous. ; Rule 142(a).
*213 In prior similar cases, we have looked at several factors, including: (1) the purpose for which the property was acquired; (2) the purpose for which the property was subsequently held; (3) the frequency, number, and continuity of sales; (4) the extent to which improvements, if any, were made to the property; (5) the business of the holder; and (6) the purpose for which the property was held at the time of its sale. See . No one of the above factors is conclusive standing alone. All of the factors taken as a whole must be considered. . From our findings it is apparent SMS was formed for the primary purpose of acquiring and selling residential and commercial properties. A secondary purpose was to hold some properties for investment. Under the partnership agreement, investment property was to be designated as such by the partnership and thereafter was not to be sold. The activities of SMS during its seven-year existence centered almost entirely on the tracts acquired in 1971. It bought the land with the intent to divide it into parcels, *214 have the parcels rezoned to increase their value, and then either sell or hold the parcels. SMS succeeded in rezoning all of the residential parcels and two of the six parcels designated at one time or another as commercial. SMS eventually sold the two commercial parcels and all but two of the residential parcels in numerous sales spread over the life of the partnership. From the time SMS acquired the land until its dissolution, all of the parcels were treated in the same manner on its books. Not a single parcel was ever designated as being held for investment, and the gain from every sale was reported as ordinary income. In fact, the record before us contains no evidence which tends to indicate that any of the property was ever "committed" by the partnership to being investment property. As we said in : While it is true that one can be in the real estate business with certain properties and at the same time hold other properties for investment, it is incumbent upon such a real estate dealer to make a clear distinction on his books and records of the various properties held by him and, where he fails to make *215 such a segregation, he is subject to ordinary income treatment for sales or dispositions of such property. * * * Nevertheless, petitioner contends that this Court should treat parcel 7 differently from the other parcels because, according to petitioner, SMS intended to keep parcel 7 and develop it with a shopping center. Although containing some evidence that Development West, one of the partners, had an interest in developing a shopping center, the record as a whole clearly shows that Wilridge, the other partner, was primarily interested in selling parcel 7 just as the other parcels were sold when rezoning was obtained. In any event, it is the intent of the partnership that governs, , affd. without published opinion , and petitioner has failed to produce any evidence that SMS intended to hold parcel 7 and develop it. We concude, therefore, that parcel 7 was held by SMS primarily for sale to customers in the ordinary course of its business. We further conclude that since part of parcel 7 was distributed by SMS to one of its partners, Development West, and was sold by such *216 partner within five years of the distribution, the gain on the sale is taxable as ordinary income and not as capital gain. [4]
Because we find that parcel 7 was held by SMS for sale to customers, it is not necessary to address respondent's alternative argument concerning the applicability of section 751 to SMS's dissolution. Decision will be entered under Rule 155.
Footnotes
1. For 1979 and 1980 petitioner filed consolidated income tax returns with its wholly-owned subsidiary, Development West Corporation. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended during the years in issue, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided.↩
3. The pertinent portions of sections 735, 751 and 1221 are as follows: SEC. 735. CHARACTER OF GAIN OR LOSS ON DISPOSITION OF DISTRIBUTED PROPERTY. (a) Sale or Exchange of Certain Distributed Property. -- * * * (2) Inventory items. -- Gain or loss on the sale or exchange by a distributee partner of inventory items (as defined in section 751(d)(2)) distributed by a partnership shall, if sold or exchanged within 5 years from the date of the distribution, be considered as ordinary income or as ordinary loss, as the case may be. SEC. 751. UNREALIZED RECEIVABLES AND INVENTORY ITEMS. * * * (D) Inventory Items Which Have Appreciated Substantially in Value. -- * * * (2) Inventory items. -- For purposes of this subchapter the term "inventory items" means -- (A) property of the partnership of the kind described in section 1221(1). SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include -- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.↩
4. Petitioner has conceded that the property was "substantially appreciated" within the meaning of section 751(d).↩